**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**NECDET AKTAS and LISA FILOMIA-AKTAS,**

                              **Plaintiffs,**             **1:09-CV-01436**

      **vs.**                                      **(MAD/DRH)**

**JMC DEVELOPMENT CO., INC., JOSEPH M.**
**CANTANUCCI, JR., GRANVILLE GLASS and**
**GRANITE, INC., GRANVILLE GLASS and**
**GRANITE OF HUDSON FALLS, INC. as successor**
**in interest to GRANVILLE GLASS and GRANITE,**
**INC., STEPHEN M. JUNG D/B/A JUNG**
**ARCHITECTURE, JAMES P. LYNCH, P.E., PLLC,**
**PAUL PRITCHER, D/B/A HAMILTON PLUMBING**
**and BRADY'S WOOD FLOORS, LLC,**

                              **Defendants.**
_____

**JMC DEVELOPMENT CO., INC.,**

              **Defendant/Third-Party Plaintiff,**

      **vs.**

**MICHAEL TERRY, NORTH EAST UNDERLAYMENTS,**
**LLC. and NORTHWOODS CONCRETE, INC.**

            **Third-Party Defendants.**
_____

**APPEARANCES:**                        **OF COUNSEL:**

COOPER, ERVING & SAVAGE LLP      Phillip G. Steck, Esq.
39 North Pearl Street
Albany, New York 12207
_Attorneys for Plaintiffs_

LaFAVE, WEIN & FRAMENT, PLLC     Jason A. Frament, Esq.
2400 Western Avenue
Guilderland, New York 12084-1534
_Attorneys for Defendant/Third-Party Plaintiff_
_JMC Development Co., Inc. and Defendant_
_Joseph M. Cantanucci, Jr._

Stephen M. Jung d/b/a Jung Architecture
P.O. Box 154
Schroon Lake, New York 12870
*Defendant Pro Se*

MILBER MAKTRIS PLOUSADIS &amp;                    Richard A. Lilling, Esq.
SEIDEN, LLP
2809 Wehrle Drive, Suite 14
Williamsville, New York 14221
*Attorneys for Defendant*
*James P. Lynch, P.E.*

ANDERSON, BYRNE LAW FIRM                         Michele L. Anderson, Esq.
48 Union Avenue
P.O. Box 3392
Saratoga Springs, New York 12866
*Attorneys for Defendant*
*Granville Glass and Granite of*
*Hudson Falls, Inc.*

Brady's Wood Floors LLC
NO APPEARANCE

OFFICE OF M. RANDOLPH BELKIN                     M. Randolph Belkin, Esq.
26 Century Hill Drive
Suite 202
Latham, New York 12110
*Attorneys for Defendant*
*Paul Pritcher d/b/a Hamilton Plumbing*

HARRIS, CONWAY &amp; DONOVAN, PLLC                   Michael C. Conway, Esq.
The Patroon Building
Five Clinton Square
Albany, New York 12207
*Attorneys for Third-Party Defendant*
*Michael Terry*

FOX &amp; KOWALEWSKI, LLP                            Brendan R. Wolf, Esq.
Four Old Route 146
PO Box 958
Clifton Park, New York 12065
*Attorneys for Third-Part Defendant*
*North East Underlayments, LLC.*

BOEGGMAN, GEORGE &amp; CORDER, P.C.                  Paul A. Hurley, Esq.
39 North Pearl Street

Albany, New York 12207
*Attorneys for Third-Party Defendant*
*Northwoods Concrete, Inc.*

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

Plaintiffs Necdet Aktas and Lisa Filomia-Aktas commenced the within action against

defendants alleging various claims arising out of work performed at their home on 223 Mill Creek

Road in Adirondack, New York.  Presently before the Court are the following motions: (1)

defendant JMC Development Co., Inc and Joseph M. Cantanucci Jr.'s motion for spoliation

sanctions against plaintiffs and summary judgment including dismissal of plaintiffs' fraud claims;

(2) defendant James P. Lynch, P.E.'s motion for summary judgment; (3) third-party defendant

Michael Terry's motion for spoliation sanctions against plaintiffs; (4) third-party defendant

Northwoods Concrete, Inc. motion for summary judgment and dismissal of the third-party

complaint pursuant to Fed. R. Civ. P. 56; and (5) third-party defendant North East

Underlayments, LLC motion for summary judgment and dismissal of the third-party complaint

pursuant to Fed. R. Civ. P. 56.[1]   Plaintiff has submitted opposition to all motions. (Dkt. No.

107).[2]  This court has jurisdiction pursuant to 28 U.S.C. § 1332.

---

[1]  In December 2010, defendants Granville Glass and Granite, Inc. and Granville Glass and Granite of
Hudson Falls, Inc. entered into a Settlement Agreement with plaintiffs.  (Dkt. No. 67).  The Agreement provided,
*inter alia*, that upon completion of the settlement terms, a Stipulation of Dismissal with Prejudice would be filed with
respect to Granville.  No such Stipulation has been filed with the Court.  On May 16, 2012, plaintiffs and defendant
Paul Pritchard d/b/a Hamilton Plumbing filed a Stipulation of dismissal with regard to, "plaintiffs' direct claim"
against defendant.  The stipulation provides, "[t]his stipulation does not affect any claims between and among
defendants". (Dkt. No. 124). Defendant Paul Pritcher d/b/a Hamilton Plumbing takes no position on the within
motions.  No appearance has been entered on behalf of Brady's Wood Floors, Inc.

[2]  Jung has appeared in this matter *pro se*.  Jung filed a "Statement of Opposition to Plaintiff's Response"
(Dkt. No. 111) with a "conclusion" that reads, "I support the motion seeking spoliation sanctions against the
Plaintiffs".  Jung has not properly cross-moved for any relief in accordance with the Federal Rules of Civil Procedure
or this Court's Local Rules.  Accordingly, the Court will consider Jung's assertions only to the extent that they are
supported by the record.

## BACKGROUND[3]

This matter contains few undisputed facts.  In 2000, plaintiffs purchased a vacation home at 223 Mill Creek Road in Adirondack, New York, located in the Town of Horicon.  On Labor Day 2008, plaintiffs met Joseph Cantanucci ("Cantanucci"), the sole owner of JMC Development Co., Inc. ("JMC") and defendant Stephen Jung ("Jung"), an architect, at their vacation home to discuss a renovation project.  Cantanucci testified that the plans for the project included two bedrooms over the garage, a playroom in the basement, new placement for the front door, a new deck and a powder room.  Plaintiffs testified that the scope of the initial contract also included a new access staircase, a new bedroom with screened in porch to replace a bedroom that was

---

[3] Third Party Defendants Northwoods and North East properly filed Statements of Material Facts pursuant to Local Rule 7.1. Defendant/Third Part Plaintiff JMC, although represented by counsel, failed to respond to these Local Rule 7.1 Statements of Material Facts.   Local Rule 7.1(a)(3) states:

> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

Local Rule 7.1(a)(3) (emphasis in original). As defendant has failed to properly respond to third party defendants' Statements of Material Facts, the Statements will be accepted as true to the extent that the facts are supported by evidence in the record. *See Orraca v. Pilatich*, 2008 WL 4443274, at *3 (N.D.N.Y.2008)*; see also N.Y. Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 648–49 (2d Cir.2005) (the Court deemed the properly supported allegations in the defendant's L.R. 7.1 Statement admitted for the purposes of the motion).

Defendants JMC/Cantanucci and Lynch submitted Statements of Material Facts in support of their motions for summary judgment.  Plaintiffs properly responded to those assertions. Therefore, to the extent supported by the record, the background set forth in this section is taken from: (1) third party defendants' Statements of Material Facts; (2) the exhibits and evidence submitted by third party defendants in support of the motions for summary judgment; (3) defendants JMC and Lynch's Statements of Material Facts and the plaintiffs' responses thereto; (4) the exhibits and evidence submitted by defendants in support of the motions for summary judgment; (5) the exhibits and evidence submitted by plaintiffs in opposition to defendants' motions for summary judgment.

Plaintiffs also submitted an Affidavit to Motions for Summary Judgment prepared by Lisa Filomia Aktas. The Court has thoroughly reviewed that affidavit.  In large part, the "facts" are not supported by the record and, in some instances, contradicted by plaintiffs' experts and witnesses.  The Court will accept the assertions in Ms. Aktas' affidavit only to the extent that they are supported by the record.  The facts recited are for the relevant time period as referenced in the complaint and third party complaint.

removed and a fire pit below a two story deck.  The work was to be performed pursuant to plans, construction documents and specifications prepared by Jung.

On or around October or November 2008, plaintiffs and JMC entered into a contract for the renovation of plaintiffs' residence at 223 Mill Creek Road.[4]   The contract was for additions and renovations to the property pursuant to the drawings prepared by Jung Architecture on October 30, 2008.   On November 14, 2008, plaintiffs paid Cantanucci $87,500.00 to start construction pursuant to the contract.  Defendant Michael Terry ("Terry") was hired by JMC to work as a contractor on the site and was paid by the hour by JMC.  Cantanucci testified that Terry was hired to supervise construction at the site.

On November 25, 2008, after demolition began, Jung contacted defendant James P. Lynch ("Lynch"), via email.  Lynch was retained for the limited purpose of performing structural engineering calculations for six specific beams.  Jung provided Lynch with drawings with markings depicting the areas and the specific beams for which Jung wanted Lynch to provide calculations. On December 3, 2008, Lynch provided a report with the requested calculations. There were no further discussions between Lynch and Jung and plaintiffs never met Lynch.

On December 11, 2008, Northwoods Concrete, Inc. ("Northwoods") sent a proposal to JMC for work at plaintiffs' home.  Northwoods is in the business of pouring residential and commercial foundations and concrete slabs.  Craig House, the owner of Northwoods, testified that he became involved with the project because he had previously worked with JMC.  The proposal included "specifications and estimates" for footings, interior pier footings, frost walls, retaining wall and 4" concrete slab.  The proposal excluded, "footings for desk post; extra additives to concrete forming and pouring on ledge rock; and layout of building corners".  On December 19,

_____

[4] The contract is undated.

2008, JMC accepted the proposal.  Northwoods poured the foundation for a crawl space which was three to four inches thick.  Craig House entered into an Indemnification, Hold Harmless and Insurance Agreement with JMC and Cantanucci.[5]  The agreement provides:

> Northwoods agrees to defend, indemnify, and hold harmless JMC and Cantanucci, . . . from and against any and all claims, suits . . . arising in whole or in part and in any manner from acts, omissions, breach or default of Subcontractor, in connection with performance of any work by Subcontractor, its officers, directors, agents, employees or subcontractors.

> Subcontractor hereby agrees that it will obtain and keep in force an insurance policy or policies to cover its liability hereunder and to defend and save harmless General Contractor and Owner in the minimum amounts of $1,000,000 per occurrence (or another appropriate agreed upon amount) for personal injury, bodily injury, and property damage.

> Said liability policies shall name General Contractor and Owner as additional insureds and shall be primary to any other insurance policies.

On December 12, 2008 and December 16, 2008, Warren County performed foundation inspections.  During these inspections, the inspector observed the footings.  The foundation inspections were passed.  On January 9, 2009, another foundation inspection was conducted and "approved".  Frank Waite Cowles, code enforcement officer for Warren County, testified that there were no problems with foundation and that it "passed" inspection.

In early 2009, Cantanucci contacted North East Underlayments, LLC. ("North East") and requested a quote for sprayfoam insulation work at plaintiffs' residence.  Douglas Kwazneski, a sales representative for North East, visited plaintiffs' residence and met Terry.  On February 27, 2009, North East prepared a "Revised Letter of Intent" to, "supply and install Icynene Insulation

---

[5] The Insurance Agreement is dated September 26, 2008.  The record contains no explanation regarding the discrepancy between the date of the Hold Harmless agreement and the date the parties contracted for the work.

System at 223 Mill Creek Rd, Adirondack, NY Aktas Proj."  Cantanucci executed the Letter of Intent on behalf of JMC.

During 2009, due to disagreements regarding the completion date and payments for the project, the relationship between plaintiffs and JMC/Cantanucci began to deteriorate.  Plaintiffs testified that they were advised, "a few days before Memorial Day" that the house was not liveable.  Therefore, they attempted to get a completion date from defendant.  Plaintiffs claim that Cantanucci involved his attorney, Paul Wein, in those discussions.  On May 26, 2009, JMC's attorney forwarded a letter to plaintiffs advising, "[w]e have been retained by JMC in reference to outstanding issues relating to a contract of work executed in October 200 regarding renovations of your home".[6]  The letter also provided, "JMC is prepared to commit to a complete date of June 26, 2009" with some conditions that were outlined in the letter.  The letter was executed by Cantanucci and Lisa Aktas.

On June 26, 2009, plaintiffs entered into a contract with George Villar ("Villar") and Atelier Consulting, LLC for owner's representation services for 223 Mill Creek Road, New York.  Plaintiffs claim that they retained Villar to "get JMC to keep its promises concerning completion of the job".   At that time, Villar was aware that JMC had retained an attorney.  Within 60 days of executing the contract with plaintiffs, Villar visited plaintiffs' home on two or three occasions.  During those visits, Villar took photographs and prepared a "punch list".  Villar testified that he deemed the workmanship to be "poor" and had concerns about the safety of the construction.  Villar also testified that he thought there were code violations.

---

[6] The copy of the letter in the record is unsigned.  The parties do not dispute that  Attorney Wein prepared the letter.

Plaintiffs testified that between June 26, 2009 and July 4, 2009, Villar visited the site with Richard Mullady ("Mullady"), president of Recony Construction.[7]  At that time, Mullady observed what he deemed to be, "safety issues with respect to the deck, fire pit and fire place."

On July 4, 2009, Cantanucci visited the site for the last time.  Cantanucci testified that at that time, the project was "90% complete".  From July 4, 2009 until July 19, 2009, JMC did not work on the house.   Cantanucci testified that at approximately the same time, he received a telephone call from Villar:

> A.    . . . he asked me to get him a copy of the approved drawings from Warren County and some other documentation along with some stuff he requested from the architect, and told me if I was to send them to him, that he would pay me for my shipping cost and three percent for my time.  So we spent the week of July 4th, I believe it was, gathering and sending him all of the documentation.

On July 12, 2009, Cantanucci forwarded an email to Villar with an outline of his "outstanding debts".  Cantanucci concluded the email, "[p]lease send a copy of all correspondence to myself, and Paul Wein, at p.wein@wyflklaw.com, so I know how to proceed".

Cantanucci testified regarding his subsequent conversations with Villar:

---

[7] The record is incomplete with respect to when and for what reasons Mullady was retained for the project. At the commencement of Mr. Mullady's deposition, counsel asked Mullady about the location of files concerning this matter.  Mullady stated that his files were at his girlfriend's house and he was unable to obtain the documentation prior to appearing for the deposition.  When asked if he would be able to produce the documentation at a later date, he responded:

> A.    I wish I can say definitely but I have to get her permission to enter the premise, I have to talk to her.  As of last night she said yes, but that can change on a moment.

Mullady testified that he prepared a spread sheet of the charges for various activities at plaintiffs' residence. Mullady never saw JMC's drawings for construction on plaintiffs' home and never had any conversations with anyone from JMC regarding the job.  Villar testified that he reviewed the contract between Recony and plaintiffs.  The record contains no contracts or any other documentary evidence regarding the work performed by Recony at plaintiffs' residence.

According to the record, Recony and Atelier Consulting LLC were formed on the same day, January 15, 2009.

8

A.      . . . [h]e gave me his phone numbers and told me he was again a mediator hired by a mutual friend John Poulin, and he was in this to make sure everyone was treated fairly.  We talked about moneys owed.  He agreed that we were very close according to his calculations on what I was owed, and that he would have a commitment from the Aktases by a certain date, and when he didn't return my calls at that date, I called him and he told me the Aktases were out of the country and he only had communication via his Blackberry phone.

*       *       *

Q.      Did there come a point in time when Mr. Villar told you that either he or the Aktases were dissatisfied with your work or the time for completion of the project?

A.      The only time that I got any information from him in that respect was an email that he sent me stating that - - well, could I back up a moment please?

A.      Right.  Mr. Villar contacted me and said that he was going to change the locks that's [sic] on the house.  Because of those beer cans that we found in the yard, he was under the impression that there were kids in the neighborhood coming to the house and drinking.  So I assumed he was going to give me a new set of keys because we had just put three new locks on the house.  Well, when I called him to get the lock set, or the new keys, he didn't return my calls but I received an email from him, and I'm sure you have a copy of it, that they installed security cameras, I'm no longer allowed on the job, and to not violate that.  And he installed security cameras at that date and to please contact him to get my equipment off the job which was locked at this point in the house.[8]

Cantanucci testified that the aforementioned communication took place after July 4th.

During their last conversation, Cantanucci and Villar arranged a meeting so that Cantanucci could

retrieve JMC's equipment.  Cantanucci could not recall when that conversation took place.

Cantanucci testified that, "[h]e made it a point with us to come let us in and never showed.  We

---

[8] The email is not part of the record herein.

came the next day and he threw all our equipment out on the lawn.  And that was the last I heard from him until they gutted the house".

Shortly thereafter, Villar recommended that plaintiffs retain Kevin Archer ("Archer")[9] and William B. Fink, Jr. ("Fink")[10].  On July 16, 2009, Archer received an email from Villar.[11]  Archer testified that the email "indicate[d] remediation".  Archer testified that he took notes from his first telephone conversation with Villar regarding Archer's involvement.  Archer testified that he and Villar had some conversation about potential litigation in the matter.  Archer testified that he knew that there was "an attorney on board".

On July 19, 2009, plaintiffs "stopped the [construction] process" by changing the locks on the house effectively precluding JMC from continuing to work on the project.  Plaintiffs made the decision due to the lack of progress and "some quality issues".  Plaintiffs testified that no one from JMC including Cantanucci was on the property after July 19, 2009.

Villar testified that in "June or July of '09", "all the sheetrock" was removed so that "the engineer come and look at the framing".  He also testified, "a few weeks later more drywall was removed to look at not just the vertical, but also the horizontal framing".

On July 27, 2009, Archer visited the site with Villar and Mullady and took photographs. Archer was at the site for roughly four hours.[12]  On August 15, 2009, Fink visited the site with

---

[9] Mr. Archer testified that has a bachelor's degree in civil engineering and architecture from Catholic University and a masters of science and engineering with a specialization in structural engineering from University of Pennsylvania. Currently, he is employed at The Archer Engineering Company.

[10] Mr. Fink has a bachelor's degree in mechanical engineering and a masters degree in environmental engineering.  Mr. Fink is a licensed engineer.

[11] The email is not part of the record herein.

[12] In opposition to the motion, Lisa Aktas provided an affidavit.  In Paragraph 26, she avers that during the July 27, 2009 visit, "Mullady opened up small holes in the walls so Archer could observe essential components of the structural design".  This statement is contradicted by Mullady's deposition testimony.

Villar.  On August 19, 2009, Fink issued a report entitled "Preliminary Engineering Review - 223 Mill Creek Road, Adirondack, New York".  The review was, "limited to the mechanical and electrical systems".  In the report, Fink outlines forty-eight items that he opines are "deficient, incomplete or non-existent" with respect to heating, ventilating, air conditioning, plumbing and electrical work.[13]

Villar testified that he recommended that plaintiffs terminate their relationship with JMC. On September 4, 2009, at plaintiffs' direction,Villar wrote a letter to Cantanucci and JMC and stated:

> . . . over the last few weeks, several independent evaluations of the Property and the work done by you or your subcontractors thereat were performed.  These evaluations revealed that said work was performed in an inadequate, negligent and un-professional manner that did not meet industry standards or applicable building codes.  It has been revealed that it will be necessary, at best, to completely remedy the work performed by you due to the gross defects, and, at worst, demolish and rebuild the currently uninhabitable property.
>
> . . . please cease and desist any involvement with any aspect of the Property, immediately turn over all documents in your possession pertaining thereto, and consider yourself on notice to refrain from entering the Property and/or damaging the Property in any way.

The letter further provided:

> Lastly, consider yourself on notice that a claim will be made by the Aktas' for the damages sustained by them due to your performance, or better yet lack thereof, at the Property.  Accordingly, please notify me in writing of the identity and policy limits of your insurance carrier and refrain from attempting to disburse and/or waste any of your corporate or personal assets.

Villar continued:

---

[13] During his deposition, Fink identified two additional reports entitled "Construction Review - Additions/Remodel for Nik & Lisa Aktas" and "Design Review - Additions/Remodel for Nik & Lisa Aktas".  Both reports were dated December 28, 2010.  The record herein does not contain either report.

> NOTICE: ANY PERSON(S) THAT IS FOUND ON THE
> PROPERTY WILL BE TRESSPASSING [SIC] AND THE
> AUTHORITIES WILL BE NOTIFIED. UNDER ABSOLUTELY NO
> CIRCUMSTANCES IS ANYONE GIVEN PERMISSION OR
> AUTHORIZATION TO VISIT THE HOUSE OR PROPERTY
> UNTIL FURTHER NOTICE.

On September 4, 2009, Archer prepared a Structural Inspection Report for the residence based upon his July 27, 2009 inspection. Archer stated, "[t]he inspection was undertaken to provide a general review of the structure of the house with reference to the 2007 New York State Residential Building Code and good standards of construction". Archer noted, "[t]he inspection was limited to visual review of the as-built conditions with some probes made through finish materials to gain better view of the structure".

On September 14, 2009, Mullady returned to the site with Archer and Fink. There is conflicting testimony regarding the condition of the house at that time. As noted previously, Villar testified that "all of the sheetrock" was removed in June or July. Fink testified that during the September visit, "basically the drywall or sheetrock had been removed for most of the building". Conversely, Mullady testified that, during the September visit, he made four or five small openings in the walls, at Villar's direction, for the experts and a few weeks later, "bigger openings" were made but by the Fall of 2009, all sheetrock was "down". Archer testified that during that visit, "sheetrock was removed in certain portions of the house so I could see the structure better". Lisa Aktas testified that "demolition" began in September 2009 which included, "[r]emoving existing sheetrock walls and ceilings, need to purchase hot water heater, connecting water to house system to test waste and septic systems and vents".

On September 22, 2009, Archer prepared Structural Inspection Report 2 after a "follow-up" inspection on September 14, 2009. Archer stated, "[t]his follow-up inspection was

undertaken to review additional exposed portions of the structure of the house following the removal of areas of sheetrock and insulation".

In the Spring of 2010, Recony began construction on plaintiffs' home.  Mullady testified that he did not salvage the sheetrock because it was "impossible" because it was painted and had holes.  Plaintiffs testified that the materials were "carted away" and "thrown out".

Procedural History and Pleadings

On November 5, 2009, plaintiffs filed a lawsuit in the Southern District of New York against defendants.[14]  On November 24, 2009, JMC filed a mechanic's lien with the Warren County Clerk against the 223 Mill Creek Road Property.  On December 22, 2009, the federal complaint was dismissed for improper venue.

On December 24, 2009, plaintiffs filed the within action in this court.  Defendants filed a motion to dismiss for lack of subject matter jurisdiction and plaintiffs' cross moved to amend the complaint.  In support of the motion to amend, plaintiffs disclosed reports from Archer and Fink.  On June 15, 2010, Chief United States District Court Judge Gary L. Sharpe issued a decision granting plaintiffs' motion to amend and denying defendant JMC's motion to dismiss.[15]

On June 21, 2010, plaintiffs filed an amended complaint.  Plaintiffs asserted several causes of action against JMC and Cantanucci including breach of contract, breach of warranty, negligence, fraud, personal liability and cancellation of mechanics' lien.[16]  Plaintiffs also asserted

---

[14] The original lawsuit in the Southern District was against the same defendants listed in the caption herein.

[15] After the decision was issued, Judge Sharpe was elevated to Chief Judge.  Chief Judge Sharpe also granted defendant Warren County's motion to dismiss plaintiffs' negligence cause of action.

[16] On October 13, 2011, the parties entered into a Stipulation discontinuing plaintiffs' claim against Joseph M. Cantanucci, Jr. personally.

causes of action for breach of contract and negligence against Jung, Lynch, Granville Granite, Brady's Wood Floors and Hamilton Plumbing.  Plaintiffs also seek punitive damages.

On November 23, 2010, JMC filed a third-party summons and complaint alleging that JMC is entitled to common law and contractual indemnification and/or apportionment of fault amount and between third-party defendants pursuant to its hold harmless and insurance agreements.   JMC also claims that third-party defendants failed to name JMC as an additional insured on its insurance policies and that JMC is entitled to a defense.

## DISCUSSION

## I.       JMC/CANTANUCCI'S MOTION FOR SPOLIATION SANCTIONS

Defendants move for spoliation sanctions and argue that plaintiffs failed to allow JMC access to the premises and destroyed all relevant evidence of JMC's purported defective work. Based upon the circumstances, defendants argue that dismissal is the appropriate remedy.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation". *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (the sanction should "serve the prophylactic, punitive and remedial rationales underlying the doctrine").   The district court is vested with wide discretion in determining the appropriate sanction.  *Reilly v. Nat-West Mkts. Group, Inc*., 181 F.3d 253, 267 (2d Cir. 1999).  "The right to impose sanctions for spoliation arises from a court's inherent power to control the judicial process and litigation, but the power is limited to that necessary to redress conduct which abuses the judicial process". *Residential Funding Corp. v. DeGeorge Fin. Corp*., 306 F.3d 99, 107 (2d Cir. 2000).

To secure spoliation sanctions based on the destruction or delayed production of evidence, a moving party must prove that: (1) the party having control over the evidence had an obligation

to preserve or timely produce it; (2) the party that destroyed or failed to produce the evidence in a timely manner had a "culpable state of mind"; and (3) the missing evidence is "relevant" to the moving party's claim or defense, "such that a reasonable trier of fact could find that it would support that claim or defense." *Id*. If a party has an obligation to preserve evidence, the degree of the party's culpability and the amount of prejudice caused by its actions will determine the severity of the sanctions to be imposed. *Henkel Corp. v. Polyglass USA, Inc*., 194 F.R.D. 454, 456 (E.D.N.Y. 2000) (citations omitted). "[A] court should never impose spoliation sanctions of any sort unless there has been a showing—inferential or otherwise—that the movant has suffered prejudice." *GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc*., 2012 WL 1414070, at *7 (S.D.N.Y. 2012) (citing *Orbit One Commc'ns, Inc. v. Numerex Corp*., 271 F.R.D. 429, 441 (S.D.N.Y. 2010) ("[i]t is difficult to see why even a party who destroys information purposefully or is grossly negligent should be sanctioned where there has been no showing that the information was at least minimally relevant.")).

### A.    Obligation to preserve

A party has a duty to preserve evidence when it has "notice that the evidence is relevant to litigation, or should have known that the evidence might be relevant to future litigation". *Fujitsi v. Fed. Exp. Corp.*, 247 F.3d 423, 426 (2d Cir. 2001). The duty to preserve extends to "any documents or tangible things (as defined by Rule 34(a)) . . . 'likely to have discoverable information that the disclosing party may use to support its claims or defenses' ". *Zubulake v. UBS Warburg, LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) (citations omitted) (the parties "must not destroy unique, relevant evidence that might be useful to an adversary"). Where a party attempts to document damage through photographs and reports and brings in counsel and experts

15

to assess the damage, that party has a duty to preserve the evidence. *Wade v. Tiffin Motorhomes, Inc.*, 686 F.Supp.2d 174, 194 (N.D.N.Y. 2009).

Here, the record establishes that plaintiffs recognized that litigation was imminent.  Thus, plaintiffs had a duty to preserve the evidence, specifically, defendants' work product.  This evidence was not only unique, but solely within plaintiffs' control.   As early as May 2009, plaintiffs were aware that JMC/Cantanucci was represented by counsel.  Plaintiffs negotiated with defendants' attorney in an effort to complete the project by June 26, 2009.  On June 26, 2009, plaintiffs began the process of  documenting all of the alleged defective construction in anticipation of litigation.  To wit, plaintiffs retained Villar, Mullady, Archer and Fink.  These individuals inspected the site, photographed the evidence and prepared reports.  Moreover, in September 2009, plaintiff clearly notified defendants that they intend to make a "claim".  Based upon the record, plaintiffs knew that litigation was "likely to be commenced" and thus, had an obligation to preserve the subject evidence.

### B.    Culpability

While plaintiffs clearly had a duty to preserve the evidence, the Court recognizes that the obligation to preserve evidence does not continue indefinitely.  *Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 458 (2d Cir. 2007).  The duty to preserve evidence may be extinguished by providing the opposing party with an adequate and meaningful opportunity to inspect.  *Gaffield v. Wal-Mart Stores East, L.P.*, 616 F.Supp.2d 329, 337 (N.D.N.Y. 2009); *see also Cedar Petrochemicals, Inc. v. Dongbu Hannong Chemical Co., Ltd.*, 769 F.Supp.2d 269, 291 (S.D.N.Y. 2011) (spoliation sanctions are not warranted when the movant has had an opportunity to inspect the evidence prior to its destruction).  When a party fails to request an inspection of the evidence after being notified of its existence, spoliation sanctions are not appropriate.  *Fujitsu*

16

*Ltd.*, 247 F.3d at 435; *see also Townes v. Cove Haven, Inc.*, 2003 WL 22861921, at *4 (S.D.N.Y. 2008) (citation omitted) (spoliation sanctions inappropriate where the defendant reconstructed a pool two years after the incident and over one year after a complaint because the opposing party was afforded a reasonable opportunity to avail themselves of the evidence); *see also Sterbenz v. Attina*, 205 F.Supp.2d 65, 73 (E.D.N.Y. 2002) (the defendant waited nearly three months to dispose of the vehicle after the plaintiff's counsel admittedly was notified of the vehicle's location and therefore provided the defendant with adequate and meaningful opportunity to inspect the evidence.

The Second Circuit has held that the "culpable state of mind" factor is satisfied by a showing that the evidence was destroyed "knowingly, even if without intent to (breach a duty to preserve it), or negligently". *Pastorello v. City of New York*, 2003 WL 1740606, at *10 (S.D.N.Y. 2003) (citing *Byrnie v. Town of Crowell, Bd. of Educ.*, 243 F.3d 93, 109 (2d Cir. 2001)). Simple or ordinary negligence is, "a sufficiently culpable 'state of mind' for the purposes of spoliation". *Wade*, 686 F.Supp.2d at 194 (the plaintiff's expert had thirty years of experience as a fire investigator and should have known that other experts would be inspecting the RV). A party acts with negligence when he makes diligent efforts to document damage in anticipation of a lawsuit but fails to take reasonable precautions to preserve the evidence. *Id*. at 195. Nevertheless, a property owner is not required to retain property that is in a negligent condition for an indefinite period of time. *Townes*, 2003 WL 28861921, at *4.

To determine whether plaintiffs were culpable, the Court examines when and to what extent defendants' work was demolished and removed from the site. The parties testified that Recony Construction was responsible for the initial demolition and remedial work. The record contains no competent or admissible evidence regarding plaintiffs' working relationship with

Recony. Without contracts or documentary evidence, there is no record establishing when Recony performed the work.  Accordingly, the Court must rely upon the parties' and witness deposition testimony regarding when the demolition/remedial work began.  In this regard, the record is conflicting.

Villar testified that "most of the sheetrock was removed" in June or July 2009.  Fink and Archer testified that during the September 14, 2009 inspection, "most of the sheet rock" had been removed.  Mullady testified that he made "four or five small openings" in the walls in September 2009 and that "all of the sheetrock" was removed by Fall 2009.  Plaintiffs claim that demolition work did not begin until September 2009.  Despite these inconsistencies, the record clearly establishes that plaintiffs and Villar knew that JMC was represented by counsel when the destruction commenced.  Villar testified that he was aware that JMC had retained an attorney and admits that he did not notify JMC or JMC's attorney about the demolition. Villar testified that he made no effort to contact the attorney and made no effort to allow defendant on the premises:

> Q.    At any time did you notify JMC or his attorney that this destruction was occurring and the property was being removed?
>
> A.    No.
>
> Q.    Okay.  So, you were aware back then that Mr. Cantanucci had an attorney?
>
> A.    Okay. Yes.
>
> Q.    At any time during the deconstruction process did you make any effort to contact my office to advise me about the deconstruction?
>
> A.    No.

*      *      *

Q.     During the last break that we had what conversation did you
       have with Mr. Steck outside?

A.     We discussed Mr. Wein's request of how come I didn't contact
       him, you know, as the attorney, when, in fact, he did get - -
       I'm sure through JMC - - a letter that we sent FedEx
       explaining that JMC is not to enter the property and that
       corrective work would happen.  So I am sure his client gave
       him a copy of that.

                        *        *        *

Q.     Was there any effort to give Mr. Wein or JMC or any of the
       other folks that were involved in the original construction an
       opportunity to go in and look at the things that you were
       claiming were done incorrectly before those things were
       remediated or taken down?

A.     No.

The record demonstrates that plaintiffs knowingly destroyed evidence.  However,

defendants have not persuaded this Court that plaintiffs acted with "bad faith".  *See Great N. Ins.*

*Co.,* 2007 WL 2687666, at *10 (the plaintiff offered the defendant minimal opportunity to

observe the turbine's disassembly and therefore, did not act with bad faith to warrant dismissal).

Defendants claim that the Court should "infer" bad faith based upon Villar's relationship with

Recony.  During depositions, Villar was questioned extensively regarding his relationship with

Recony including the location of Recony's office and Villar's prior consulting work performed on

behalf of Recony.  Villar maintained that he was not an owner, employee, nor did he have any

interest in Recony.  Plaintiffs fail to cite to any caselaw to support this proposition and the Court

is not persuaded by the conclusory claim.  Defendants also allege that bad faith should be

assumed based upon Villar's criminal history.  The record establishes that Villar was convicted of

grand larceny in the second degree and larceny and scheming to defraud in the first degree.  Villar

served 37 months in prison and was ordered to pay restitution in the amount of $914,560.80.

19

Moreover, Villar has eleven prior criminal convictions dating back to 1990. While Villar's criminal history is part of the record herein, defendants fail to cite to any caselaw to support the contention that this history warrants a finding of bad faith *per se* on this issue.

The Court finds that plaintiffs were grossly negligent and knowingly altered and destroyed defendants' work. Plaintiffs made diligent efforts to document the evidence in anticipation of litigation **before** "locking out" defendants. Moreover, plaintiffs retained experts who photographed the scene and prepared reports **before** Villar sent the September 2009 correspondence notifying defendants that plaintiffs would file a claim. Plaintiffs have failed to establish that they were forced or compelled to destroy any evidence for any reason including, but not limited to, code violations or any other safety concerns. Moreover, even assuming that remediation was necessary, the record contains no evidence demonstrating that defendants were aware of such urgency. Thus, defendants have established that plaintiffs acted with a degree of culpability sufficient to permit the imposition of sanctions by this Court. *See Residential Funding*, 306 F.3d at 108.

### C.    Relevance

Relevant evidence is evidence that a reasonable trier of fact would find that supports the party's claim or defense. *Residential Funding*, 306 F.3d at 107. "When a party destroys evidence in bad faith, the bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party". *Id*. at 109. If a party destroyed evidence through negligence then there must be extrinsic evidence to demonstrate that the destroyed evidence was relevant and would have been unfavorable to the destroying party. *Great N. Ins. Co.,* 2007 WL 2687666 at *11 (citation omitted). Typically, deposition testimony is used to establish relevance. *Id*. However, circumstantial evidence may support the

inference that the destroyed evidence contained information supporting the movant's claims. *Kronisch v. U.S.*, 150 F.3d 112, 128 (2d Cir. 1998).  The party seeking the sanctions must adduce sufficient evidence from which a reasonable trier of fact could infer that "the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction".  *Id.* at 127.   "Courts must not hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence, because doing so would allow parties who have destroyed evidence to profit from that destruction."  *Cedar Petrochemicals, Inc.*, 769 F.Supp.2d at 290 (citations omitted).

Defendants claim that all of their work was destroyed and as a result, their experts are unable to provide opinions.   JMC's work product is at issue in this case.   To establish relevance, defendants provided an affidavit from Conrad Hoffman, P.E.  Mr. Hoffman is a professional engineer retained by defendants to provide, "opinions and conclusions regarding work performed by defendants".  On January 28, 2011, Mr. Hoffman inspected plaintiffs' home at 223 Mill Creek Road.  Mr Hoffman opines, "I was unable to inspect any of the work that JMC performed.  It was wholly and completely destroyed, according to my review of [ ] documents and my site inspection".  Mr. Hoffman stated:

> My inspection revealed that a reconstruction of the premises that was wholly and completely different from the work performed under the Jung design and JMC contract.  The scope of work was significantly different.  This was not a remediation under any definition of the word.  It was a remodel of a completely different and far more expansive design.

Moreover, Mr. Hoffman stated:

> I did, in fact, review photographs exchanged during the discovery process including ones allegedly taken by George Villar, however, there is absolutely no method to determine what these photographs depict.

21

According to plaintiffs, the demolition included the roof, sheetrock, Icynene (spray foam insulation), the decking, the patios, the flooring and carpeting, siding and fireplace.  Defendants have presented sufficient evidence to establish that they suffered prejudice from the destruction of evidence.  The best evidence of defendants alleged liability was destroyed at plaintiffs' direction.  Without any evidence of defendants' work, defendants' experts are unable to inspect the property and offer an opinion regarding whether defendant's work was defective.

### D.      Appropriate Sanction

Destruction of evidence occurs, "along a continuum of fault ranging from innocence through the degree of negligence to intentionality.  The resulting penalties vary accordingly".  *Pirrello v. Gateway Marina,* 2011 WL 4592689, at *4 (E.D.N.Y. 2011).  The Court must determine the appropriate sanction based on: (1) the fault of the litigant against whom sanctions are sought; and (2) the degree of prejudice suffered by the movant due to the destruction or loss of the evidence at issue.  *Townes*, 2003 WL 22861921, at *3 (citation omitted).  Traditional sanctions for spoliation include preclusion, monetary sanctions, or an adverse inference instruction.  *Residential Funding*, 306 F.3d at 101.  Sanctions may include dismissal of a suit however, dismissal should only be imposed in extraordinary circumstances.  *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc*., 845 F.2d 1172, 1176 (2d Cir. 1988).  There are alternative sanctions that would "level the evidentiary playing field", such as adverse inference or preclusion sanctions.  *See id.*  These sanctions are severe and are reserved for egregious conduct or situations in which the loss of the relevant evidence has so prejudiced the moving party that preclusion or the adverse inference is necessary to restore the moving party to its pre-loss position.  *Residential Funding*, 306 F.3d at 112.  An adverse inference instruction is available when a party knowingly or negligently destroys evidence.  *Id.* at *10 (the adverse inference was not appropriate as the

defendant failed to demonstrate that the inspection of the destroyed part would have supported its defense).  One of the purposes of an adverse inference is to restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.  *Kronisch*, 150 F.3d at 126.   An instruction to the jury "that the [destroyed] evidence would have been unfavorable to the party responsible for its destruction, serves to restor[e] the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence."  *Id*.  (alteration in original).

In this instance, in opposition to the motion, plaintiffs cite to *Calpine Corp. v. AP&M Field Servs., Inc*., 2008 WL 5159775 (S.D.N.Y. 2008).  The *Calpine* case involved the failure of a turbine engine used by the plaintiff to deliver power to JFK International Airport.  The plaintiff claimed that the defendant was liable for failing to maintain the turbine.  Within a few days of the incident, the parties were aware that litigation was possible and lawyers became involved.  A few days later, the defendant's employees arrived to examine the turbine but were not able to adequately do so at the plaintiff's premises.  The next day, the defendant advised the plaintiff that it would not repair the turbine.  A few weeks later, the plaintiff notified the defendant that it intended to have an expert examine the turbine.  During the inspection, the engine was disassembled, repaired and various damaged parts were discarded.  On the defendant's motion for sanctions, the evidence established that the plaintiff never advised the defendant of the inspection and never gave the defendant an opportunity to have an expert present.  *Id*. at *3.  Conversely, the defendant did not seek an opportunity to complete it's testing of the subject engine until three and a half months after the failure.  *Id*. at *4.  The court concluded that, "neither party behaved as might ideally have been expected".  The evidence established that the defendant was aware that

repairs were in progress and that the plaintiff needed to complete the repairs expeditiously.  The

Court concluded:

> It is somewhat disingenuous of AP & M to blame Calpine for failing to notify it that an inspection would be performed, when it did not for its own part timely demand the opportunity to inspect the turbine fully, to be present for any testing performed by Calpine, or at least to examine any defective or damaged part.  A party cannot sleep on its rights while an adversary predictably conducts its own expert examinations in diligent preparation for litigation, and then complain that it was not invited to participate.

*Id*. at *3-4.

The Court denied the defendant's motion for spoliation and held that the jury must resolve

these issues:

> Calpine has essentially opened the door to adverse jury fact-finding, which it could easily have prevented by a more cautious and responsible course of action, including inviting AP & M to be present for expert testing and retaining the damaged parts after repairs were completed.  AP & M is entitled to put these matters to the jury . . .

*Calpine*, 2008 WL 5159775, at *5.

*Calpine* is distinguishable from the facts at hand.  Here, plaintiffs did not take the steps

that Calpine took to notify defendants of the impending destruction of the evidence.  Moreover, in

*Calpine*, the defendant was aware, for at least three months, of the plaintiff's immediate need to

remediate and failed to act.  Here, there is no evidence that plaintiffs were compelled to remediate

the property for any reason or further, there is no evidence that defendants were aware of any

such immediate need or urgency to remediate the property.

The Eastern District case of *Henkel Corp. v. Polyglass USA, Inc*., 194 F.R.D. 454, 456

(E.D.N.Y. 2000) is instructive.  In *Henkel*, the plaintiff repaired a leak in a roof using the

defendant's polyester membrane.  The evening after the repair, a fire originated in "combustible

material".  *Id*. at 455.  On March 28, 1996, two days after the fire, the plaintiff hired an expert to

inspect the scene and take photographs.  The plaintiff also hired a company to inspect the building

and to perform any necessary demolition work.  Three weeks after the fire,  demolition work

began and the fire debris was removed.  *Id*.  The project was completed on May 8, 1996.  On

December 3, 1996, defendant received a summons and complaint.  The defendant hired an expert

to evaluate all available evidence including deposition transcripts, photographs, and discovery.

The defense expert issued an affidavit and stated that by clearing the fire debris, the defendant

was precluded from having an opportunity to perform a similar investigation of the fire scene.

Moreover, the photographs, "did not contain sufficient detail to provide reasonable assistance in

determining the cause and origin of the fire".  The defendant's expert stated that it was impossible

for him or any other qualified expert to reach a conclusion regarding the cause of the fire.  The

defendant moved for spoliation sanctions.  The Court held that while the plaintiff did not act with

"bad faith", the plaintiff was "highly culpable" for failing to notify the defendant of the

destruction of the evidence.  Moreover, the defendant's inability to inspect the fire scene was

highly prejudicial.  The Court held:

> Because plaintiff has had the opportunity to have its fire expert inspect
> the fire scene and defendant has not been afforded the opportunity
> either to inspect the scene or any actual fire debris, the evidentiary
> playing field between the two parties is clearly not level.  Because
> plaintiff is responsible for this evidentiary disparity, some form of
> sanction is appropriate.

*Id*. at 457.

The Court granted the defendant's motion and concluded that the appropriate remedy was

"an adverse inference charge instructing the jury that it may infer from plaintiff's removal of the

fire debris that the evidence from the fire scene would have been unfavorable to the plaintiff."

The Court reasoned, "the plaintiff is free at trial to proffer an explanation as to why it removed

the fire debris and why it failed to notify defendant of the removal".  *Id*.

In this matter, plaintiffs argue that sanctions are not appropriate because defendants have been provided with photographs and expert reports. This Court adopts the reasoning of the Eastern District in the *Henkel* case and rejects this argument. Defendants' inability to inspect the evidence resulted in significant prejudice to defendants. Moreover, the Court will not compel defendants to rely on plaintiffs' expert review and photographs. *Henkel*, 194 F.R.D. at 455-56. As Magistrate Judge Treece stated in *Allstate v. Gonyo*, "[i]f [the] claim of spoliation is true, then the evidentiary playing field is decidedly tilted in favor of [the plaintiff], notwithstanding the presence of another competing expert report and photographs". *Allstate Inc. Co. ex rel. Lothridge v. Gonyo*, 2009 WL 962698, at *9 (N.D.N.Y. 2009).

A district court and trial judge has wide discretion in sanctioning parties and this Court has considered the conduct of the parties in determining the appropriate sanction. Despite plaintiffs' "gross negligence", the Court finds that dismissal is too drastic a remedy. *See Allstate v. Gonyo*, 2009 WL 1924769, at *3 (N.D.N.Y. 2009) (the subject cabin was razed or substantially renovated before the defendant was aware that he was a potential litigant). While Villar admittedly failed to notify defendants of the impending destruction, the record clearly establishes that even after receiving Villar's letter, defendants did not pursue a site inspection. During Cantanucci's deposition, he testified regarding Villar's September 2009 letter:

> Q.    When you received that letter, did you contact your counsel?
>
> A.    I did.
>
> Q.    And what did you do with respect to the property? Did you undertake any efforts to return to the property and ascertain its condition?
>
> A.    Never.

*      *      *

Q.      Let's look at page P193 on there.  "It has been revealed that it will be necessary at best to completely remedy the work performed by you and at worse demolish and rebuilt [sic] the currently uninhabitable property".  Did you see that?

A.      I did.

Q.      Was that notice to you that for good or for ill, whether they were right or wrong, if their intention was to do it over again, right?

A.      Yes.

Q.      Did you take any steps to investigate what in fact was occurring at the property?

A.      No.

Q.      Did you contact Mr. Villar or the Aktases or anyone else and asked to inspect the property?

A.      I believe we did.

Q.      When?

A.      I don't know when, but certainly - -

Q.      Did you?

A.      Did I?

Q.      Yes.

A.      Did I contact?  Did you read this letter?  It says not to contact anyone, not to do it, not to liquidate your assets.

Q.      Okay.  Did you take any steps?

A.      What steps?  I don't understand the question.

Q.      Any steps?  The answer is maybe you didn't because you didn't think you had - -

A.      I don't know what steps could be taken.  I'm asking you.

Q.      All right.  Did you do anything - -

A.      I contacted my attorney.

Q.      And after that, you didn't do anything?  You left it in the hands of your counsel, is that right?

A.      I believe so.

                    *       *       *

Q.      Excluding any conversations with your counsel, did you obtain any knowledge from any source, other than your attorneys, as to what efforts might have been made to inspect the property on your behalf?

A.      Efforts to inspect?  I really don't understand the question.

Q.      Are you aware of any efforts to inspect the property?

A.      That I tried to inspect the property?

Q.      Right.  Or anybody else acting on your behalf?

A.      Not acting on my behalf, no.

Defendants have not established that anyone on behalf of JMC requested, and was denied, an inspection of the subject property.  Indeed, none of the parties expressed any sense of urgency with respect to this issue until nearly six months after plaintiffs filed their amended complaint. On December 1, 2010, the parties discussed this issue with United States Magistrate Judge David R. Homer.  Judge Homer issued an order permitting defendants and their experts to conduct a site inspection on December 14, 2010 or December 29, 2010.  (Dkt No. 61).

Nevertheless, based upon the entire record, any request by defendants to inspect the premises, upon receipt of Villar's September 2009 letter, would have been futile.  It is undisputed that plaintiffs changed the locks on the site in July 2009.  However, the "lock out" did not provide defendants with notice that the evidence would be destroyed.  Indeed, Cantanucci and Villar testified that, at that time, they were working towards resolving the issue in a manner that was

28

favorable to all parties.  However, Villar also testified that most of the sheetrock was removed as early as June or July 2009 and plaintiffs' experts and plaintiffs testified that a significant portion of JMC's work was removed in early September 2009.  Therefore, even if defendants requested an opportunity to inspect the property immediately upon receipt of Villar's September 2009, the property was already in a different condition as defendants' work was altered and/or destroyed.  Based upon the record, plaintiffs failed to afford defendants sufficient notice and a reasonable opportunity to inspect the site prior to destroying the evidence.[17]

### E.      Plaintiffs' Claims Regarding Design Defect

In opposition to the motion, plaintiffs claim that spoliation "is inapplicable as a matter of law" because plaintiffs were forced to remediate due to design defects as well as construction errors.  Plaintiffs' misinterpret and misapply the law.  The proposition that plaintiffs cite is relevant in product liability actions and thus, has no application to the facts herein.  "[I]f a product was manufactured defectively, its defect is likely to be particular to the individual product.  Consequently, a party's examination of that product may be critical to ascertaining, among other things, the presence of the defect."  *Collazo-Santiago v. Toyota Motor Corp*., 149 F.3d 23, 29 (1st Cir. 1998).  "In design defect cases, a party's examination of the individual product at issue may be of lesser importance as the design defect alleged can be seen in other samples of the product."  *Id*.  A "defective design claim arguably does not require evidence of the product which actually failed, since all of the same type of product are uniformly defective".  *Beers v. Gen. Motors Corp*., 1999 WL 325378, at *6, n. 12  (N.D.N.Y. 1999); *see also Harley v. Makita USA, Inc*.,

---

[17] In opposition to defendants' motion, plaintiffs provided correspondence dated June 9, 2010 from plaintiffs' counsel to JMC's counsel.  In the letter, counsel enclosed previous letters to "Mr. Cohen" dated May 25, 2010 and May 28, 2010.  In the May 28, 2010 correspondence, Mr. Steck writes, "[o]f course, your client, or anyone acting at its request, is free to inspect the property at any time.  Reasonable notice of same is customarily appropriate".  This evidence is irrelevant as it post dates the destruction of the evidence by nearly a year.

1998 WL 156973, at *11 (E.D. Pa. 1998) (citations omitted) (the court refused to apply spoliation in a product liability claim based on a design defect).

In support of this argument, plaintiffs cite to one case, *Green v. Ford Motor Co.*, 2008 WL 5070489 (S.D. Ind. 2008) (the plaintiff alleged only defective design of his automobile and the Court found "[t]he allegedly defective design of the Explorer was not destroyed" with the plaintiff's Explorer). The Court has thoroughly reviewed the *Green* case and finds it readily distinguishable from the facts at hand and thus, not controlling herein. In *Green*, the plaintiff did not, as plaintiffs herein have, alleged a manufacturing or construction defect. Here, plaintiffs' claims are based both on construction and design defects that are unique to plaintiffs' home. Therefore, without an opportunity to examine the components of their work that were allegedly defective, defendants cannot properly defend the action. *See Travelers Prop. Cas. Co. of Am. v. Cooper Crouse-Hinds, LLC.*, 2007 WL 2571450, at *5, n. 31 (E.D. Pa. 2007).

### F.    Conclusion/Remedy

In light of plaintiffs' actions regarding the preservation of critical evidence and the prejudice that defendants have suffered at the loss of the evidence, the Court finds that an adverse inference charge is appropriate. After considering plaintiffs' actions, Villar's involvement, the negligence in destroying relevant and necessary evidence, the Court will issue an adverse inference charge that permits the jury to infer that the missing evidence was favorable to defendants. The Court will fashion the exact language of the charge at trial and the parties will be permitted to submit proposed instructions in this regard. Accordingly, defendants' motion for spoliation sanctions is denied in part and granted in part.

## II.    JMC'S MOTION FOR SUMMARY JUDGMENT AND DISMISSAL OF PLAINTIFFS' FRAUD CLAIMS

### A.    Standard on Motion for Summary Judgment

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56 ( c ). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986). A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the Court, viewing the evidence in the light most favorable to the nonmovant, determines that the movant has satisfied this burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact requiring a trial. *See id.* If the nonmovant fails to carry this burden, summary judgment is appropriate. *See id.*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir.1994). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F .3d 81, 86 (2d Cir.1996) (citing Fed.R.Civ.P. 56 ( c ).  In applying this standard, the court should not weigh evidence or assess the credibility of witnesses.  *Hayes v. New York City Dep't of Corr.*,  84 F.3d 614, 619 (2d Cir. 1996) (citation omitted).  These determinations are within the sole province of the jury.  *Id*.

### B.      Proof of Damages

In JMC/Cantanucci's reply memorandum of law, defendants vaguely asserts that plaintiffs should be precluded from offering proof of damages as they have provided no opinion as to the cost of repairs and have submitted no proof as to what their actual alleged damages are as a result of defendants' conduct.  Defendants argue that the spreadsheet prepared by Mullady is inadequate as it does not include any amounts for remediation.  Counsel's vague and unsupported arguments are insufficient to establish a *prima facie* case of entitlement to judgment as a matter of law.  The issue of damages is an issue to be resolved by the jury.

### C.    Fraud Claims

Count IV of the Amended Complaint is entitled "Fraud" and alleges as follows:

> Defendants JMC and Cantanucci concealed workmanship that it knew was defective by hiding same so that it could not be reasonably detected by plaintiffs or their owner's representative.

> Plaintiffs' engineers and representatives were able to discover the concealed defects in the premises through invasive probing after defendants JMC and Cantanucci had left the job.

> JMC and Cantanucci both knew of all the numerous structural defects and dangerous conditions that existed at the Premises some of which were revealed through the inspections by the Warren County Buildings Department.

> Instead of disclosing the code violations, structural defects, and dangerous conditions, JMC and Cantanucci routinely informed plaintiffs that all inspections had been passed and that the next payment was due, leading the Aktas' to believe that all inspections were successful and did not reveal any defects.

> To induce plaintiffs to make further payments to defendants JMC and Cantanucci, defendants fraudulently concealed dangerous and defective conditions on the site and misrepresented to plaintiffs the status and findings of Warren County's inspections of the premises.

> Plaintiffs justifiably relied on the fraudulent misrepresentations and continued to transmit additional payments to JMC and Cantanucci. To induce plaintiffs to make further payments to defendants JMC and Cantanucci, defendants intentionally sabotaged work done at the

32

> premises so that plaintiffs would not be able to occupy the premises until further work was complete and further payments made.
>
> Defendants JMC and Cantanucci were further so grossly negligent and reckless in their methods for constructing the premises that their actions may be considered fraudulent as to plaintiffs.

In the prior Memorandum-Decision and Order, Chief Judge Sharpe discussed plaintiffs' fraud claims and held:

> Having reviewed the Aktases' proposed amendments regarding their claim of fraud against JMC and Cantanucci, the court concludes that they sufficiently allege a viable fraud claim. In essence, the Aktases allege that on several occasions, after receiving the County's inspection reports, JMC and Cantanucci failed to disclose the full extent of the inspections and affirmatively misrepresented the results of the inspections in order to induce the Aktases to make the next payment. In addition, the Aktases allege that JMC and Cantanucci knowingly concealed dangerous and defective conditions and intentionally sabotaged the work done on the site to prolong the construction period and receive further payments. Therefore, at this juncture, the court concludes that these allegations are specific enough and sufficiently distinct from their breach of contract claim to withstand JMC's motion to dismiss.

*Aktas v. JMC Dev. Co., Inc., et. al.*, Dkt. No. 31, at pp. 16-17.

To prove fraud under New York law, "a plaintiff must show that: (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc*., 98 F.3d 13, 19 (2d Cir. 1996) (citing *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995)). "Federal courts will dismiss fraud claims predicated on allegations that defendants did not intend to meet their contractual obligations." *LCO Destiny v. Michaels Stores, Inc.,* 543 F.Supp.2d 129, 131 (N.D.N.Y. 2008) (citing *Marriott Int'l, Inc. v. Downtown Athletic Club of New York City, Inc*., 2003 WL 2134056, at *6 (S.D.N.Y. 2003)). To

maintain a claim of fraud in such a situation, a plaintiff must either: "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Maxim Group LLC v. Life Partners Holdings, Inc*., 690 F.Supp.2d 293, 307 (S.D.N.Y. 2010) (citing *Bridgestone/Firestone, Inc*., 98 F.3d at 20) (collecting cases)). Where alleged mispresentations are squarely addressed in the contract, they do not give rise to a duty apart from the underlying agreement and therefore, are insufficient to sustain a cause of action for fraud. *MacQuesten Gen. Contracting, Inc. v. HCE, Inc*., 191 F.Supp.2d 407, 410 (S.D.N.Y. 2002) (the plaintiff's allegation that the defendant made fraudulent statements regarding payment to laborers and vendors working towards the completion of the subcontract was not extraneous to the contract but firmly rooted in the subcontract agreement). Moreover, to succeed on a fraud claim, plaintiff must allege "special damages" that were caused by the misrepresentation and unrecoverable as contract damages. *Bridgestone/Firestone*, 98 F.3d at 20.

Here, plaintiffs asserted fraud claims based upon four theories: (1) fraudulent inducement based upon the Warren County inspections; (2) fraudulent concealment; (3) gross negligence and recklessness in the construction; and (4) sabotaged work done at the premises.[18] The Court will address each claim separately.

### 1.    Fraudulent Inducement

---

[18] In plaintiffs' Memorandum of Law, plaintiffs asserted an additional fraud claim relating to $8,000.00 paid to Granville Granite. This claim is not set forth in the Amended Complaint. Accordingly, the court will not consider these allegations in the context of the within motion. *Lyman v. CSX Transp., Inc*, 364 F. App'x 699, 701 (2d Cir. 2010) (the district court "need not be consider[] arguments raised for the first time in opposition to summary judgment) (citing, *inter alia, Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) (declining to reach merits of argument raised for first time in opposition to summary judgment)).

Plaintiffs contend that defendants fraudulently represented that the property passed inspection. This allegation cannot support a separate fraud action because the alleged fraudulent representation involved a matter that was not extraneous to the contract. *See Lovely Peoples Fashion, Inc. v. Magna Fabrics, Inc.*, 1998 WL 422482, at *9 (S.D.N.Y. 1998) ("[t]he failure or inability to deliver the proper quantity of conforming goods goes to the heart of defendants' contractual obligations"); *see also Pesca v. Barbera Homes, Inc.*, 942 N.Y.S.2d 313, 321 (Sup. Ct. 2012) (the fraud claims were subject to dismissal because the alleged misrepresentations regarding the grading of the lot prior to closing related to the defendants obligation to complete the work in compliance with all relevant laws and regulations); *see also Brine v. 65th St. Townhouse LLC*, 20 Misc.3d 1138A (Sup. Ct. 2008) (the defendants alleged failure to obtain a temporary certificate of occupancy, pay contractors or perform work within the agreed upon time did not form the basis of a claim for fraud). Moreover, even assuming the alleged misrepresentations were not merely redundant of the breach of contract claim, the Warren County inspections were matters of public record. *See Pesca*, 942 N.Y.S.2d at 322 (allegations of fraud dismissed because the claims were based upon public records that are available to the plaintiff).[19]

## 2.     Fraudulent Concealment

Plaintiffs allege that, "the house was sealed up concealing wires without covering, unconnected plumbing, and nails which had been driven into the heating ducts making it impossible for the heating system to function effectively". On a claim for fraudulent concealment, plaintiffs must establish the elements of fraudulent misrepresentation, i.e., that the fraud is extraneous to the contract, but are also required to set forth that the defendant had a duty to disclose material information. *Swersky v. Dreyer and Traub*, 219 A.D.2d 321, 326 (1996); *see*

---

[19] The Court is not persuaded by plaintiffs' reliance upon the *Mora* case as that matter involved a motion to dismiss rather than a motion for summary judgment. *See Mora v. RGB, Inc*., 17 A.D.3d 849 (3d Dep't 2005).

*also P.T. Bank Cent. Asia, New York Branch v. ABN AMRO Bank, N.V.*, 301 A.D.2d 373 (1st Dep't 2003).  Here, plaintiffs have not sustained that burden.  Plaintiffs claims are based on defendants' duties that arise from the contract and not from any legal duty independent of that agreement.  Moreover, plaintiffs make conclusory allegations and cite to Paragraph 51 of Fink's August 2009 report.  However, Fink's report does not contain a paragraph enumerated "51" and moreover, there is no reference to any such alleged concealment anywhere in Fink's report.

### 3.  Gross Negligence or Reckless Conduct

Plaintiffs assert that defendants, "were further so grossly negligent and reckless in their methods for constructing the premises that their actions may be considered fraudulent as to plaintiffs".  Allegations that are, "merely a restatement, albeit in slightly different language, of the 'implied' contractual obligations asserted in the cause of action for breach of contract does not transform the claim into a tort claim".  *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 390 (1987) (citing *Deerfield Commc'ns Corp. v. Chesebrough–Ponds, Inc*., 68 N.Y.2d 954 (1986) (fraud claim held to be dressed-up version of contract cause of action)).

There is no evidence in the record that JMC/Cantanucci had an independent duty to construct or design the house separate and apart from the contractual obligations.  Plaintiffs may not transform their breach of contract action into a tort action with conclusory allegations that are merely restatements of implied contractual obligations.  *See Niagara Mohawk Power Corp., v. Stone & Webster Eng'g Corp*., 725 F.Supp. 656, 662 (N.D.N.Y. 1989) (citing *Clark-Fitzpatrick*, 70 N.Y.2d at 389-90) (the plaintiff's cause of action for gross negligence alleged that the defendant failed to exercise "due care" in designing the project, locating utility lines acquiring necessary property rights and informing plaintiff of problems with the project before construction began).

### 4.    Sabotage

In the amended complaint, plaintiffs vaguely assert, "defendant's intentionally sabotaged work done at premises so that plaintiffs would not be able to occupy the premises until further work was completed and further payments made".   Generally, sabotage allegations state more than a mere breach of contract and thus, would be actionable in tort if the defendant breached a legal duty existing independently of the contractual relations between the parties. *Crabtree v. Tristar Automotive Group, Inc*., 776 F.Supp. 155, 162 (S.D.N.Y. 1991) (citing *Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 899 (2d Cir. 1980)).   However, in this matter, plaintiffs have failed to prove, or even allege, that such a duty existed and therefore, there is no basis for fraud on this claim.   "If the alleged acts of . . . sabotage   . . . are merely examples of how [the defendant] breached the contract in a fraudulent manner, [t]he basis of the action remains the contract, and . . . there is no claim for fraud" . *Burstyn v. Horl*, 1985 WL 260 (S.D.N.Y. 1985) (citation omitted).

To summarize, plaintiffs have failed to specify or come forward with any proof to substantiate the broad allegations of fraud contained in the complaint.   Moreover, plaintiffs have not alleged that they sustained "special damages" as a result of defendants' alleged fraud that are not recoverable under the contract.   Based upon the aforementioned, defendant JMC and Cantanucci's motion for summary judgment and dismissal of plaintiffs' fourth cause of action as against JMC and Cantanucci is GRANTED.

### III.    TERRY'S MOTION FOR SPOLIATION SANCTIONS

Terry cross moves for spoliation sanctions against plaintiffs. As a third-party defendant, Terry's position is analogous but distinguishable from JMC's.  In July 2010, Terry stopped working with JMC.  On November 24, 2010, defendant/third-party plaintiff filed a third party complaint against Terry, North East and Northwoods. (Dkt. No. 54).  On January 26, 2011, Terry

served an answer with cross claims. (Dkt. No. 71).  It is undisputed that Terry was never afforded

any opportunity to inspect the property and was not even impleaded as a third party defendant in

the action until after the evidence was destroyed.  *See Thiele v. Oddy's Auto and Marine, Inc*., 906

F.Supp. 158, 162 -163 (W.D.N.Y. 1995).   Terry has suffered prejudice by the spoliation of the

evidence, however, Terry has not submitted any caselaw in support of his motion for dismissal of

plaintiffs' claim or, "for the proposition that a third party defendant is entitled to dismissal as a

result of spoliation by the plaintiff".  *See Pirrello v. Gateway Marina*, 2011 WL 4592689, at *7

(E.D.N.Y. 2011).  As in *Pirrello*, this Court holds that both Terry and JMC/Cantanucci are in the

same position of not having had an inspection of the property.  The adverse inference instruction,

the substance of which will be discussed at the time of trial, will serve the same remedial purpose

with respect to the prejudice Terry suffered from not being afforded an opportunity to inspect the

property.   Accordingly, defendant's motion is granted in part and denied in part.

## IV.     LYNCH'S MOTION FOR SUMMARY JUDGMENT

In the amended complaint, plaintiffs assert two causes of action against defendant Lynch:

breach of contract and negligence.  Lynch moves for summary judgment and dismissal of

plaintiffs' amended complaint on the following grounds: (1) no privity existed between plaintiffs

and Lynch; (2) Lynch cannot be held liable for the negligence of others; (3) Lynch's calculations

were adequate; (4) the scope of Lynch's services was limited; and (5) plaintiffs cannot support a

claim of damages due to spoliation of the evidence.[20]

### A.     Privity

---

[20] Lynch also moves for permission to serve an answer to the amended complaint.  In support, Lynch
provided a Stipulation executed by Lynch's counsel and plaintiffs' counsel regarding the service of the answer.
Accordingly, the Court grants this portion of defendant's motion.

"The rule which bars recovery for economic losses in the absence of privity as applied to actions against architects or engineers is settled as a matter of New York law." *Key Int'l Mfg., Inc. v. Morse/Diesel, Inc.*, 142 A.D.2d 448, 453 (2d Dep't 1988).  "A viable tort claim against a professional requires that the underlying relationship between the parties be one of contract or the bond between them so close as to be the functional equivalent of contractual privity." *Ossining Union Free Sch. Dist., v. Anderson LaRocca Anderson*, 73 N.Y.2d 417, 439 (1989).  "An obligation rooted in contract may [nevertheless] engender a duty owed to those not in privity when the contracting party knows that the subject matter of a contract is intended for the benefit of others . . . an intention to benefit a third party must be gleaned from the contract as a whole". *Logan-Baldwin v. L.S.M. Gen. Contractors, Inc.*, 2012 WL 1371007, at *2 (4th Dep't 2012) (citing *Van Vleet v. Rhulen Agency*, 180 A.D.2d 846, 848–849 (3d Dep't 1992)).  "Where performance is to be made directly to a third party, that party is generally deemed an intended beneficiary of the contract and is entitled to enforce it or there is, at least, a presumption that the contract was for the benefit of the third party". *Key Int'l Mfg., Inc.*, 142 A.D.2d at 455.  "It is almost inconceivable that those . . . who render their services in connection with a major construction project would not contemplate that the performance of their contractual obligations would ultimately benefit the owner  . . . [I]t is obviously inferable that they knew, or should have known, that someone owned the [property], and that such person or entity was to be the ultimate beneficiary of their . . . services". *Id.*

In this matter, plaintiffs assert a cause of action for breach of contract against Lynch:

> JMC had a contract with James P. Lynch, P.E., PLLC to perform work at the premises.

> Plaintiffs were intended beneficiaries of the contract.

> Plaintiffs did not obtain the benefits of that contract.

> Lynch failed to perform structural calculations, as deemed necessary
> by Jung Architecture, that were capable of accomplishing in a safe,
> professional, and workmanlike manner the improvements which
> plaintiffs contracted for at the premises.
>
> Lynch failed to comply with professional and industry standards in
> performing the structural calculations to be used for the plans for the
> premises.

Plaintiffs assert that they were third-party beneficiaries of the contract between Jung and Lynch.  In order to prevail, plaintiffs must demonstrate that their relationship with Lynch "approaches that of privity." In order to satisfy the "functional equivalent of privity" test, plaintiff must allege that: (1) defendant was aware that his reports/work product were to be used for a particular purpose or purposes; (2) plaintiffs were known parties to defendant and relied on defendant's work product in furtherance of that purpose; and (3) defendant's conduct links him with plaintiffs and evinces his understanding of plaintiffs' reliance. *ECOR Solutions, Inc. v. Malcolm Pirnie, Inc.*, 2005 WL 1843253, at *5 (N.D.N.Y. 2005) (citing *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 551 (N.Y. 1985)).

Courts in New York have routinely, "refused to dismiss breach of contract causes of action asserted by property owners against subcontractors who performed construction services on their property".  *Logan*, 2012 WL 1371007, at *4 (the plaintiffs raised a triable issue of fact whether they were intended third-party beneficiaries of the contract between the sub-contractor and general contractor . . . the plaintiffs submitted evidence establishing that, pursuant to that contract, the subcontractor was to provide services directly to the plaintiffs).  In this matter, there is no dispute that Lynch entered into an agreement with Jung, not with plaintiffs. However, the evidence establishes that Lynch was retained by Jung on behalf of plaintiffs and further, that Lynch was aware of that fact.  Lynch prepared a "Scope of Review" entitled "Nik & Lisa Aktas".  Moreover, Lynch's report is entitled "Nik & Lisa Aktas 223 Mill Creek Road Town of Horicon,

NY" and the first sentence reads, "[t]his is a major renovation to the Aktas home." *See*

*Rotterdam Square v. Sear-Brown Assoc. P.C.,* 246 A.D.2d 871, 872 (1998) (citations omitted) (

the "Proposal and Specifications" for construction of prepared by the defendants clearly indicated

that it was "prepared for" plaintiffs).

Viewing the evidence in a light most favorable to plaintiffs, the Court finds material issues

of fact exist with respect to the issue of privity between plaintiffs and Lynch, specifically,

whether plaintiffs were third party beneficiaries.  Accordingly, defendant's motion for summary

judgment, on this basis, is denied.

### B.       Scope of Services/Contract and Negligence Allegations

In the alternative, defendant argues that if plaintiffs are third-party beneficiaries of the

agreement, they are bound by the limited scope of the agreement and cannot "enlarge the scope of

services by virtue of Archer's general assertions".  Specifically, defendant disagrees with

Archer's claims that Lynch: (1) should have conducted a site visit; (2) should have "conveyed all

necessary information to the other members of the design and construction team"; and (3) should

have obtained and reviewed a final set of construction drawings.  Defendant argues that he cannot

be held liable because his recommendations as to placement of structural members were either not

conveyed to the contractor or not implemented if they were relayed.  Moreover, Lynch argues that

his calculations were adequate based upon the information provided.

In support of these arguments, Lynch relies upon the affidavit of Al Longtin, P.E.  Longtin

is a structural engineer and performed a third party review of Lynch's work as it related to

plaintiffs' residence.  Longtin's report contains facts, allegations, assessments and an evaluation

based upon a review of all drawings, documents and deposition testimony.  Longtin opines that

Lynch's services were conducted in accordance with the standard of care expected in the

structural engineering industry and further, that , "any structural deficiencies determined to have existed were the result of Jung's failure to convey correct information to JPL [Lynch] through drawings, Jung's failure to convey JPL's recommendations to the contractor and the contractor's failure to implement JPL's recommendation".

Conversely, plaintiffs claim that Lynch may be held liable for failing to exercise reasonable care despite the "scope of services" agreed to with Jung.  Plaintiffs provide an Affidavit from Kevin G. Archer dated March 1, 2012 which includes, as an exhibit, a December 30, 2009 report prepared by Archer entitled "Review of Engineer's Material".  Archer inspected the premises, reviewed the relevant documents, including Lynch's reports and calculations, and opined that Lynch deviated from accepted engineering standards.  Archer issued a detailed report, which is reproduced in plaintiffs' opposition, with specific errors he found in Lynch's structural recommendations including: the garage door header; girder supporting floor joists for bedrooms 3 and 4; header at old exterior wall under family room; header supporting wall above bonus room extension; and header supporting family room, nook and kitchen floor.

The Court is wary of awarding summary judgment where there are conflicting expert reports.  *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010); *Rand v. Volvo Fin. N. Am.*, 2007 WL 1351751, at *3 (E.D.N.Y. 2007) ("[i]t is not for the court to decide which expert opinion is more persuasive.").  "The conflicting opinions and statements of both parties' experts on material factual issues with regard to the . . . workmanlike procedures . . . can only be determined by a trial on the merits".  *Regent Ins. Co. v. Storm King Contracting, Inc.*, 2008 WL 563465, at *10 (S.D.N.Y. 2008).  Archer's affidavit raises issues of fact with respect to defendant's alleged negligence and the scope of Lynch's responsibilities, as defined by the contract.  *See Kung v. Zheng*, 73 A.D.3d 862, 863 (2d Dep't 2010).  It would be improper for the

Court to engage in a "line by line" examination of Longtin's and Lynch's opinions in comparison to Archer's opinions.  The jury must make a determination regarding the credibility of all expert witnesses.  *See Scanner Techs. Corp. v. Icos Vision Sys. Corp.*, 253 F.Supp.2d 624, 634 (S.D.N.Y. 2003) ("The credibility of competing expert witnesses is a matter for the jury, and not a matter to be decided on summary judgment.").

Moreover, the Court has reviewed the record and finds that there are numerous, genuine issues of fact that preclude an award of summary judgment.  To wit, Lynch's allegation that Jung failed to convey Lynch's calculations to the contractor is contradicted by Jung's deposition testimony.  Jung testified that Lynch's calculations, "were utilized to make changes in the field that departed from the original plans".  Jung testified that the calculations were communicated to Joe and/or Mike either during site visits or via email.  Jung also testified that he gave the calculations to Joe or to Mike and they were installed in the field.  Jung stated that any changes were documented through emails to Terry, Cantanucci and the County.

Lynch's motion raises factual issues that are disputed and not properly decided by the Court on a motion for summary judgment.  Rather, the jury must examine the evidence and determine, based upon the conflicting expert reports and testimony, the extent, if any, of Lynch's liability.  Based upon the record, Lynch's motion is denied in its entirety.

### C.    Spoliation

In his moving papers, Lynch references spoliation and argues that the conditions examined by Archer were not verified by Longtin.  Lynch asserts that the alleged defective conditions were removed and replaced with new structural members.  As such, Lynch argues that plaintiffs cannot support a claim for damages.  The Court is unable to discern exactly what relief Lynch is requesting, however, to the extent that he argues that dismissal is warranted due to

spoliation, he has not submitted sufficient evidence to warrant spoliation sanctions. Clearly, plaintiffs had a duty to preserve the evidence but Lynch has not submitted any argument, or proof, regarding any opportunity to inspect the evidence, culpability, relevance or prejudice. Accordingly, this portion of Lynch's motion is denied with leave to renew at trial.

## V.  NORTHWOODS' MOTION FOR SUMMARY JUDGMENT AND DISMISSAL OF THIRD-PARTY COMPLAINT

In the third party complaint, JMC alleges that it is entitled to common law and contractual indemnification and/or an apportionment of fault among and between the defendants pursuant to its hold harmless agreement. JMC also alleges that Northwoods failed to name JMC as an additional insured on its insurance policies. Northwoods moves for summary judgment and dismissal of the third party action as well as the cross claims asserted by Terry and North East. JMC, Terry and North East do not oppose Northwoods' motion. Plaintiffs, who do not have a claim against Northwoods, submitted opposition to the motion. Accordingly, Northwoods argues that the motion is "unopposed" and should be granted.

### A.  Plaintiffs' Opposition

While conceding that they do not have a direct claim against Northwoods, plaintiffs submitted a Memorandum of Law in Opposition to Northwoods' motion for summary judgment. "A party seeking to recover upon a claim, counterclaim or cross-claim" or "a party against whom a claim, counterclaim or cross-claim is asserted" may seek or oppose a motion for summary judgment. Fed.R.Civ.P. 56(a)-(b). Some district courts have interpreted Rule 56 to provide that "co-defendants do not have standing to oppose a defendant's motion for summary judgment when the motion is unopposed by the plaintiff" and when the defendants have not filed claims against each other. *See Dorvin v. 3901 Ridgelake Drive, LLC*, 2012 WL 1057599, at *3-4 (E.D.La. 2012) (collecting cases); *see also Thurman v. Wood Group Prod. Servcs, Inc*., 2010 WL 5207587,

at *1 (E.D.La. 2010) (the defendant did not file a cross-claim, so it is not a "party" to the co-defendant's motion for Summary Judgment under Rule 56).

In *Hawes v. Blast-Tek, Inc*., 2010 WL 2680778, at *1-2  (D.Minn. 2010), the district court was confronted with a similar situation and, following the precedent set by other circuits, explained:

> The complicating fact here is that Blast-Tek-Quick Tanks' and Forecast's co-Defendant-has filed a Memorandum opposing the pending Motions. Although rare, the situation is not unprecedented, as the cases below attest. The question is whether the Court should consider Blast-Tek's arguments. That is, can Blast-Tek prevent the dismissal of Hawes's claims against its co-Defendants, when Hawes himself agrees that those claims should be dismissed?
>
> In the Court's view, this question must be answered in the negative. Hawes is the master of his claims.  He has concluded, based on the evidence adduced in discovery, that he lacks a good-faith basis to continue to press his claims against the moving Defendants. The Court does not believe that Blast-Tek can force Hawes to maintain those claims-in possible violation of Federal Rule of Civil Procedure 11-simply because it does not like the outcome if Quick Tanks and Forecast are dismissed: any liability on Hawes's claims will be assessed against Blast-Tek alone, rather than against Blast-Tek, Quick Tanks, and Forecast. The mere fact that Hawes included Blast-Tek as a Defendant does not give it a "vested interest in the presence of [Quick Tanks or Forecast] as a co-party."

*Id*. (citations omitted).

Here, plaintiffs rely upon Archer's conclusions and argue that there are issues of fact as to whether Northwoods' negligence contributed to plaintiffs' damages. The Court will not consider plaintiffs' arguments because plaintiff has asserted no claims against Northwoods.  Plaintiffs have no standing to oppose Northwoods' motion for summary judgment.  *See Brewer v. Dodson Aviation*, 2006 WL 3231974, at *4 (W.D.Wash. 2006).

### B.    Third-party Plaintiff's and Co-Third-Party Defendants' Failure to Oppose

Federal Rule of Civil Procedure 56 provides, in pertinent part:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law ... If the opposing party does not ... respond[, by affidavits or as otherwise provided in this rule, by setting out specific facts showing a genuine issue for trial], summary judgment should, <u>if appropriate</u>, be entered against that party."

Fed. R. Civ. Pro. 56 ( c ), (e)(2) (emphasis added).

Local Rule 7.1(b)(3) provides:

> Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

Third party plaintiff and co-third party defendants have not opposed the pending motion and counsel offers no explanation or excuse for this omission.  Insofar as the parties failed to oppose the motion as required by Local Civil Rule 7.1, JMC, Terry and North East implicitly consent to the relief sought in the motion.  Courts in this district have held that, "a movant's burden with regard to an unopposed motion is lightened such that, in order to succeed, the movant need only show its entitlement to the relief requested in its motion, which has appropriately been characterized as a 'modest' burden".  *Keefe v. Subway of Cazenovia, LLC*, 2010 WL 2560532, at *2 (N.D.N.Y. 2010) (citing N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . .")) (collecting cases).

### C.      Merits of Motion

To establish a claim for common-law indemnification, "the one seeking indemnity must prove not only that it was not guilty of any negligence beyond the statutory liability but must also

prove that the proposed indemnitor was guilty of some negligence that contributed to the causation of the accident" *Perri v. Gilbert Johnson Enters., Ltd.*, 14 AD3d 681, 684–685 (2d Dept 2005). "[A] party seeking contractual indemnification must prove itself free from negligence, because to the extent its negligence contributed to the accident, it cannot be indemnified therefor". *Cava Constr. Co., Inc. v. Gealtec Remodeling Corp.*, 58 A.D.3d 660, 662, 871 N.Y.S.2d 654. A party who is itself negligent cannot obtain either common-law or contractual indemnification for injury caused by its negligence. *Mott v. Tromel Contr. Corp.*, 79 A.D.3d 829, 831 (2d Dep't 2010). Northwoods moves for summary judgment dismissing all common-law indemnity and contribution claims. "[F]or a party to prevail on a motion for summary judgment and dismissal of common-law indemnification or contribution claims against it there must be 'a *prima facie* showing that it was free from negligence in the happening of the accident'" *Weitz v. Aztek Constr. Corp.*, 65 A.D.3d at 678, 681 (2d Dep't 2009).

Here, plaintiffs' expert, Archer, addressed the foundation work at plaintiffs' home and provided opinions regarding the crawl space, rear foundation wall, foundation slab and a missing foundation wall in the garage and faulty concrete work for the patio and sidewalk. Northwoods proof establishes that Northwoods did not perform any excavation, backfill or compacting of the soil. Northwoods did not perform any work on plaintiffs' garage or patio and Northwoods did not remove any portion of any of the walls or existing foundation. Northwoods did not pour the cement patio or perform any work on the patio. Northwoods also cites to the County of Warren Foundation Inspection reports dated December 12, 2008, December 16, 2008 and January 5, 2009 and Frank Waite Cowles' deposition testimony as further support for judgment as a matter of law. Cowles testified that there were no issues with Northwoods' work, no code violations and that the foundation work passed inspection. Northwoods also argues that Cantanucci's deposition

testimony supports summary judgment.  Cantanucci testified that he had "no complaints" regarding Northwoods' work.  Based upon the record, Northwoods tendered sufficient evidence to satisfy its initial burden of demonstrating entitlement to summary judgment as a matter of law with respect to third party plaintiff's indemnification and contribution claims.  *See Curley v. Gateway Commc'ns Inc*., 250 A.D.2d 888, 892 (3d Dep't 1998).

Northwoods produced a Certificate of Insurance which indicates that JMC was named as an additional insured to a Commercial General Liability Insurance Policy effective through October 15, 2009.  Therefore, the third-party claim for breach of contract for failure to procure insurance is not viable.  *See Chunn v. New York City Hous. Auth*., 83 AD3d 416, 417 (1st Dep't 2011) (dismissing claim where the subject insurance policy listed the claimant as an additional insured) ).

Northwoods' motion for summary judgment and dismissal of the third-party complaint and all cross claims asserted by Terry and North East is granted.

## VI.   NORTH EAST UNDERLAYMENT'S MOTION FOR SUMMARY JUDGMENT AND DISMISSAL OF THIRD PARTY COMPLAINT

North East moves for summary judgment and dismissal of the third-party complaint and all cross claims arguing that there is no evidence of wrongdoing on the part of North East sufficient to raise a question of fact.  North East also argues that JMC's indemnification claims must be dismissed because the parties did not enter into a contract whereby North East agreed to indemnify JMC.  Finally, North East argues that it named JMC as an additional insured and thus, JMC's third cause of action is obsolete.  JMC did not respond or otherwise oppose the motion. Northwoods and Terry did not oppose the motion to dismiss the cross claims.  Plaintiffs submitted the only opposition to North East's motion arguing, "North East played a very minor role in the saga at 223 Mill Creek Road".

48

As discussed in Part VA, plaintiffs' opposition to North East's motion will not be considered by this Court.  Further, JMC and co-third party defendants Terry and Northwoods have not opposed the motion.  As discussed in Part VB, the failure to oppose the pending motion without any explanation or excuse for the omission, lessens the movant's burden on the motion.

In April 2009, Cantanucci wrote a letter of recommendation and stated that North East's, "product and service is excellent - I recommend them highly".  During his deposition, Cantanucci did not complain about the quality of North East's work.  Lisa Aktas testified that she was unaware of any problems with North East's work and admitted that North East was contacted to perform additional work on the site during the remediation process.   Archer testified, consistent with his report, that the area over the garage was completely sprayed with insulation, creating a conditioned space which is heated and cooled along with the main house.  In his report, Archer "recommended", "[v]erify and coordinate the intended insulation and venting for the attic space above Bedrooms 3 and 4".  Archer did not opine, as plaintiff alleges, that "North East covered up roof vents with spray foam insulation, thereby preventing proper ventilation in the attic".  The Letter of Intent contains the following provision:

> **\*All roof areas in house are to be vented, garage roof will be unvented.**

Accordingly, North East claims that their work was performed properly and pursuant to JMC's direction.  North East also contends that no express or implied indemnification agreement exists and no party to the action has produced any evidence to contradict that assertions.  North East produced a Certificate of Insurance which indicates that JMC was named as an additional insured to a Commercial General Liability Insurance Policy effective through April 2009.

Thus, North East has produced sufficient evidence to satisfy its burden of demonstrating entitlement to summary judgment as a matter of law with respect to third party plaintiff's

49

indemnification and contribution claims.  North East's motion for summary judgment and dismissal of the third-party complaint and all cross claims asserted by Terry and Northwoods is granted.

## CONCLUSION

**IT IS HEREBY**

**ORDERED**, that defendant JMC and Cantanucci's motion for spoliation sanctions (Dkt. No. 97) is **GRANTED IN PART AND DENIED IN PART** consistent with this Order; it is further

**ORDERED**, that defendant JMC and Cantanucci's motion for summary judgment and dismissal (Dkt. No. 97) of plaintiff's fourth cause of action (Fraud) as against JMC and Cantanucci is **GRANTED**; it is further

**ORDERED**, that defendant JMC and Cantanucci's motion for summary judgment (Dkt. No. 97) is denied in all other respects; it is further

**ORDERED**, that third-party defendant Terry's motion for spoliation sanctions (Dkt. No. 106) is **GRANTED IN PART AND DENIED IN PART**, consistent with this Order, it is further

**ORDERED**, that defendant Lynch's motion to serve an answer to the amended complaint (Dkt. No. 102) is **GRANTED**; it is further

**ORDERED**, that defendant Lynch's motion for summary judgment (Dkt. No. 102) is **DENIED**; it is further

**ORDERED**, that defendant Lynch's motion for spoliation sanctions (Dkt. No. 102) is **DENIED** with leave to renew; it is further

**ORDERED**, that third-party defendant Northwoods' motion for summary judgment and dismissal of the third-party complaint and all cross claims (Dkt. No. 96) is **GRANTED**; it is further

**ORDERED**, that third-party defendant North East's motion for summary judgment and dismissal of the third-party complaint and all cross claims (Dkt. No. 99) is **GRANTED**.

**ORDERED** that a Settlement Conference is scheduled in this matter for Friday, August 24, 2012 at 10:30 A.M. in Albany.  The parties are directed to appear at that time and make submissions in advance of the conference as directed in this Court's Order Setting Settlement Conference.

**IT IS SO ORDERED.**

Dated:  June 28, 2012
        Albany, New York

Mae A. D'Agostino
U.S. District Judge